# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANNE BLAKE,<br>　　　Plaintiff, | |
| 　　　v. | No. 3:10-cv-01858 (JAM) |
| KEVIN DOWE,<br>　　　Defendant. | |

## RULING GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This case involves a car accident and a somewhat unusual constitutional claim. Plaintiff Anne Blake has sued defendant Kevin Dowe, a trooper with the Connecticut State Police. Blake does not claim that Trooper Dowe caused the accident that hurt her. She claims instead that Trooper Dowe failed to properly investigate it. According to Blake, Trooper Dowe's investigation was corrupted by his desire to exonerate a young and attractive woman driver who allegedly caused the accident while driving drunk. Having already sued and settled with the young woman driver in state court, Blake now presses this claim in federal court under 42 U.S.C. § 1983—contending that Trooper Dowe's concealment of key facts violated Blake's federal constitutional right to access to the courts, because it prevented her from recovering in state court the full scope of her damages from the accident.

Trooper Dowe has now moved for summary judgment to dismiss Blake's claim. Because Blake has failed to show that any misconduct of Dowe foreclosed her from seeking and obtaining relief in state court, I conclude that the motion for summary judgment should be granted.

1

## Background

In the early morning hours of September 8, 2006, a car careened off the interstate highway between New Haven and Hartford and eventually burst into flames. Fortunately, the driver—Natashia Cabral—and two male passengers emerged from the car without apparent serious injury. Connecticut State Police Trooper Kevin Dowe—the defendant in this case—was among the first responders to the scene. Cabral told Trooper Dowe that another car had struck her car from behind, causing her to veer off the road, and that the other car had then disappeared without a trace into the night.

But another motorist on the scene was plaintiff Anne Blake. At some point after Trooper Dowe filed his accident report recounting Cabral's version about the hit-and-run driver, Blake obtained a copy of his report, and she called to complain that the report was wrong. First, Blake wanted to know why she and her car were not mentioned at all in the report. She also asked why the report did not indicate that Cabral was drunk, and Trooper Dowe replied that "she wasn't drunk." Blake disagreed and gave a handwritten statement to the State Police that offered a very different version of what happened.

Blake's version claimed that there was no phantom hit-and-run car that caused the accident as Cabral had claimed. Instead, Cabral's car had cut Blake's car off from the right side and then fishtailed wildly, striking guardrails on both sides of the highway before coming to rest on the left side of the road and catching fire. Blake had to take emergency maneuvers to bring her own car to a sudden stop, resulting in Blake fracturing her clavicle (which she said that she only realized the following day after the accident).

Blake also claimed that when Cabral emerged from her car, she yelled to Blake, "I fell asleep" and "I almost killed you!" Blake would later describe Cabral as a very attractive young

2

woman. As Cabral clung to Blake crying, she smelled Cabral's breath and concluded that she was drunk. According to Blake, two other travelers had stopped at the accident scene, and they told her that they heard Cabral and her two male passengers talking about how Cabral was drunk and how they would lie to the police to protect Cabral from a drunk driving charge.

Despite Blake's version, Trooper Dowe was not alone in concluding that Cabral was not drunk. Two more state troopers, a firefighter, and two ambulance EMTs were among the first responders to the scene. Each of them saw Cabral, and—contrary to Blake's account—none of them thought that Cabral appeared drunk.

After requesting and receiving medical records from Blake, Trooper Dowe issued two supplemental accident reports in mid-December 2006. These amended reports included Blake's version of events as recounted above, but they also noted that Blake had stated while at the scene of the accident that she had not been involved or injured. Trooper Dowe reported that he could not conclude whether the accident caused Blake's injury, and he stated that the investigation would be closed because it was not possible to identify the car that had hit Cabral's car and left the scene.

In the meantime, Blake called Cabral, and she learned from Cabral that soon after the crash, Trooper Dowe had inappropriately sent Cabral a text message of a personal nature. At about 1:30 one morning several days after the accident, Trooper Dowe sent Cabral a text message to the effect: "I'm out with my buddies, what's up?"

Blake lodged a complaint with the State Police about Trooper Dowe, and this triggered an internal affairs investigation. The internal affairs investigator interviewed Cabral in June 2007, and she stated that before the accident she had been with her two male passengers at the Oracle Club in New Haven and where she had one vodka drink. She stated that, while at the

3

scene, she told Trooper Dowe that she had had one drink that night, that Trooper Dowe had

shone a flashlight into her eyes to look for signs that she was drunk, and that he had asked her to

take part in a walk-a-straight-line field sobriety test (which she said that she could not do because

she was shaking so much from the accident).

Trooper Dowe's reports had not included this information. When interviewed by the

internal affairs investigator, Trooper Dowe denied that Cabral had told him that she had been

drinking; according to Trooper Dowe, Cabral said she took her two male friends to a bar but she

said she had not been drinking. He also denied that he had shone a flashlight in Cabral's eyes and

that he had asked her to take part in a field sobriety test.

In November 2007, the internal affairs division released a report of its investigation of

Trooper Dowe, and it concluded in relevant part that Trooper Dowe committed misconduct by

falsely denying that he had looked in Cabral's eyes on the night of the accident and falsely

denying that he had asked Cabral to take a field sobriety test.[1] The report further concluded that

Trooper Dowe insufficiently investigated the accident.

Blake eventually filed suit for her injury in Connecticut state court against Cabral as well

as against the car's owner (Cabral's father) and against Blake's own insurance company (to

compensate Blake for her injuries beyond the limits of Cabral's insurance coverage and to

reimburse Blake for injuries caused by an unidentified driver in the accident). Her state court

complaint alleged negligence, including a claim that Cabral was operating her car while under

---

[1] During the internal affairs investigation, the investigator heard conflicting statements about whether troopers had checked Cabral's sobriety. Blake told the investigator that Trooper Dowe said he knew Cabral was not drunk because "he 'had looked in her . . . eyes.'" Doc. #32-2 at 10. Cabral and one of her passengers also indicated that Dowe had used a flashlight to look into Cabral's eyes, and Cabral said Dowe "asked her to walk a straight line." *Id.* at 20, 23. An EMT told the investigator that he believed the trooper with Cabral had conducted a field sobriety test "but could not say so for sure." *Id.* at 21. In contrast, Dowe told the investigator that "[h]e did not do any sobriety tests on [Cabral] and neither did any other troopers at the scene to his knowledge." *Id.* at 25. He stated "he did not do gaze nastagmus and did not have her walk a straight line." *Ibid.* Another trooper at the scene "did not see anyone check the operator's eyes or do field sobriety tests." *Id.* at 16.

the influence of alcohol or drugs. In October 2010, Blake settled the state court case for a payment of $100,000, which was the value of the combined limits of the insurance policies for both the car driven by Cabral and Blake's own car.

Despite this state court settlement, Blake decided to file the instant suit in federal court against Trooper Dowe. Her federal complaint contends that Trooper Dowe "concealed evidence and misrepresented evidence for the purpose of exonerating Ms. Cabral from liability," *see* Doc. #1 ¶ 10, and that this concealment so impeded Blake's state court claims that it amounted to a violation of Blake's constitutional right of access to the courts. More specifically, the complaint alleges that Trooper Dowe concealed the following three facts: (1) "the identity of the owner of the vehicle" operated by Natashia Cabral, (2) "the fact that Ms. Cabral had been drinking prior to the accident and that she had admitted that fact to him," and (3) "the fact that he administered a field sobriety test to Ms. Cabral and that she was unable to complete the said test." *Id.* ¶ 10(A), (B), (C). According to Blake, Trooper Dowe prevented her from suing all responsible parties and led her to settle her state court case for substantially less than her damages and with a large payment to her state court attorney from the settlement amount. *Id.* ¶¶ 11–14. Blake's complaint also includes a state law claim against Trooper Dowe for spoliation of evidence. Trooper Dowe now seeks summary judgment on Blake's claims.

## Discussion

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the

nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann Kwan v. Andalex Group, LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)).

The general right of the people to seek relief from the courts for harms inflicted by others may seem fundamental but it is not a right that is set forth in explicit terms in the Constitution. As Professor Akhil Amar has explained, "[a]lthough the written Constitution says little about remedies, a powerful regulatory ideal and background legal principle (rather like the precept that no man should be a judge in his own case) prevailed at the Founding: For every legal right there should be a judicial remedy." Akhil Reed Amar, *America's Unwritten Constitution* 209–210 (2012). Thus it was that Chief Justice Marshall famously declared that "[t]he very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury," and that "[o]ne of the first duties of government is to afford that protection." *Marbury v. Madison*, 5 U.S. 137, 163 (1803).

More recently, the Supreme Court has recognized a constitutional right of access to the courts, although noting that the right's precise source in the Constitution remains uncertain. *Christopher v. Harbury*, 536 U.S. 403, 415 n.12 (2002). Whatever its pedigree, a right of access to the courts correlatively means a right to be free from obstruction of this right by the

government. And so the Second Circuit has recognized that "[t]he constitutional right of access [to the courts] is violated where government officials obstruct legitimate efforts to seek judicial redress." *Whalen v. County of Fulton*, 126 F.3d 400, 406 (2d Cir. 1997).

Both the Supreme Court and the Second Circuit have further distinguished between two potential types of right-of-court-access claims: *forward-looking claims*, which allege that "official action is presently denying an opportunity to litigate," and *backward-looking claims*, which allege that the government "caused the loss or inadequate settlement of a meritorious case." *Harbury*, 536 U.S. at 413–14; *see also Sousa v. Marquez*, 702 F.3d 124, 127–28 (2d. Cir. 2012); *Chen v. Young*, Civil No. 3:11cv1524 (JBA), 2014 WL 298705, at *2 (D. Conn. Jan. 28, 2014); Una A. Kim, Note, *Government Corruption and the Right of Access to Courts*, 103 Mich. L. Rev. 554, 562–63 (2004).[2]

This case involves a backward-looking claim. Such a claim may be brought only "if the governmental action caused the plaintiff's suit to be dismissed as untimely, or if official misconduct was so severe as to 'render[] hollow his right to seek redress,'" including, for example, a circumstance where "public officials withheld from the plaintiff 'key facts which would form the basis of the . . . claims for redress,'" thereby "'completely foreclos[ing]'" a judicial remedy. *Sousa*, 702 F.3d at 128 (internal citations omitted).

As noted above, the complaint alleges in part that Trooper Dowe concealed the identity of the owner of the car driven by Cabral. Doc. #1 ¶ 10(A). True enough, Trooper Dowe's reports did not identify Cabral's father by name as the car's owner, but it is undisputed that the reports specified the make and model of the car, its vehicle identification and license plate numbers, and

---

[2] Even in acknowledging this distinction, neither the Supreme Court nor the Second Circuit has expressly recognized as constitutionally valid a backward-looking claim of a right of access to the courts. *Harbury*, 536 U.S. at 414 n.9; *Sousa*, 702 F.3d at 128. Because defendant has not disputed the point, I assume the validity of a backward-looking claim for purposes of this ruling.

its insurance company and policy number. The father/owner's name was readily discoverable from this information. And it was in fact discovered. Blake found out the owner/father's name in time to join him as a defendant in the state court lawsuit and to obtain a settlement from his insurance company (as well as to agree to release the father from personal liability). Therefore, as to this allegation of concealment, the right-of-access claim fails for lack of any showing that the omission of the owner's name impeded Blake from seeking recovery against the car owner.

The complaint further alleges that Trooper Dowe's reports concealed "the fact that Ms. Cabral had been drinking prior to the accident and that she admitted that fact to him," and "the fact that he administered a field sobriety test to Ms. Cabral and that she was unable to complete the said test." *Id.* ¶ 10(B)–(C). These allegations also fall well short of establishing a constitutional denial-of-access claim. The undisputed evidence is that Blake herself believed from the outset that Cabral had been drinking. Her own observations of Cabral would have been competent evidence, and there was nothing to prevent her from seeking recovery—as she in fact did in her state court action—on the ground that Natashia Cabral had been drinking.

Because a denial-of-access claim is available "only if a judicial remedy was 'completely foreclosed' by the false statement or nondisclosure," it follows that "[i]f a party is aware of the basic facts undergirding his claim but fails to make his case, whether through inadequate discovery or otherwise, he may not relitigate that dispute through a denial-of-access claim." *Sousa*, 702 F.3d at 128, 129 (citation omitted). As the Second Circuit has further explained, "a plaintiff who has knowledge of the facts giving rise to his claim and an opportunity to rebut opposing evidence *does* have adequate access to a judicial remedy." *Id.* at 128. Accordingly, "[i]f a governmental official is lying . . . the plaintiff can attempt to demonstrate the falsity of the official's statements through discovery and argument before the court," but the point of a denial-

of-court-access claim is "not to convert every instance of deception by a governmental witness into a separate federal lawsuit." *Id.* at 128–29.

Blake further contends that Trooper Dowe's concealment prevented her from timely filing a statutory claim against the Oracle Bar in New Haven under the Connecticut Dram Shop Act, Conn. Gen. Stat. § 30-102, especially in light of the Act's requirement at that time that Blake have served notice within sixty days of the accident of her intent to sue the bar for damages.[3] This claim fails for multiple reasons. First, Blake's complaint says nothing about loss of a Dram Shop Act claim. To properly plead a backward-looking denial-of-access claim, a plaintiff's complaint must give fair notice to the defendant by identifying the "underlying cause[s] of action for relief that the plaintiff would have raised had it not been for the [state action] alleged," and must state the underlying claim "in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued." *Harbury*, 536 U.S. at 405, 417.

Even assuming that Blake's complaint had alleged foreclosure of a Dram Shop Act claim, it would be speculative to suggest that any misconduct of Trooper Dowe prevented Blake from filing such a claim. Although Cabral allegedly told Trooper Dowe that she had drunk vodka at a bar, there is no evidence that she told him the name of the bar or that Trooper Dowe was obliged to identify and report the name of the bar. Therefore, even if Trooper Dowe had fully reported what Cabral allegedly told him, Blake would not have known which of the scores of bars in New Haven or elsewhere against which she should serve notice and file suit.

The name of the Oracle Bar first emerged in June 2007—about nine months after the accident—when Cabral was interviewed by the state police internal affairs investigator.

---

[3] The Dram Shop Act was amended effective October 1, 2006—a few weeks after the date of the accident in this case—to impose a 120-day notice-of-suit requirement, in place of the former 60-day requirement that applied to this action. *See* An Act Concerning Adequate Notice in Dram Shop Actions, P.A. 06-69 (amending Conn. Gen. Stat. § 30-102).

Although this disclosure did not occur until after the sixty-day Dram Shop Act period for filing a notice-of-claim, no special time limit prevented Blake from filing a common law recklessness action against the Oracle Bar. *See O'Dell v. Kozee*, 307 Conn. 231, 271, 53 A.3d 178 (2012) (discussing the continued viability of "a common-law action for willful, wanton and reckless service of alcohol"). But she did not, and this failure suggests that neither would she have filed a Dram Shop Act claim against the Oracle Bar had she known about the Oracle Bar within the sixty-day time limit for filing a notice of claim.

Moreover, even assuming that Blake had known about the Oracle Bar within the Dram Shop Act's sixty-day time limit for notice, her prospects for a successful claim would have been highly uncertain because the Dram Shop Act requires proof not merely that a customer became drunk at a liquor establishment but also that the establishment sold alcohol to a customer who was visibly or perceivably so. *See O'Dell*, 307 Conn. at 240. Blake has not adduced any evidence that she could have met this requirement for relief under the Dram Shop Act.

In short, Blake has waived her Dram Shop Act argument for failure to have pleaded it in her complaint, and she has also failed to establish a genuine issue of fact to suggest that Trooper Dowe's conduct prevented her from advancing a Dram Shop Act claim. *See Sousa*, 702 F.3d at 129 (affirming denial of summary judgment for right-to-court-access claim because the plaintiff "has not shown a genuine dispute of material fact with respect to an alleged injury resulting from [allegedly erroneous official] reports").

Blake further claims that Trooper Dowe's misconduct meant that she had to settle her lawsuit against Cabral and her father for less than she otherwise would have. But Blake received the full policy limits as a settlement of her claim, and she was fully aware from the State Police internal affairs report of the scope of Trooper Dowe's omissions at the time that she settled the

10

state court case in October 2010. Nor is there any basis beyond surmise to support Blake's claim that she would have paid her attorney less from her settlement if not for Trooper Dowe's misconduct. Blake's constitutional right-of-access claim has no merit.

In light of the dismissal of Blake's federal constitutional claim, I decline to exercise supplemental jurisdiction over Blake's remaining state law claim of spoliation of evidence. *See, e.g.*, *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117–18 (2d Cir. 2013). The state law claim of spoliation of evidence is dismissed for lack of jurisdiction and without prejudice to plaintiff's seeking relief on this claim in state court.

## Conclusion

For the reasons set forth above, defendant's motion for summary judgment (Doc. #32) is hereby GRANTED. Judgment shall enter in favor of defendant on plaintiff's federal constitutional claim. Plaintiff's state law claim is dismissed without prejudice.

The clerk is directed to close this case.

It is so ordered.

Dated at Bridgeport this 29th day of July 2014.

/s/ Jeffrey Alker Meyer

Jeffrey Alker Meyer
United States District Judge

11